In re INTERBANK FUNDING CORP., IBF VI–Secured Lending Corporation, IBF Collateralized Finance Corporation and IBF Premier Hotel Group, Inc., Debtors.

Nos. 02–41590 (BRL), 02–41591(BRL), 02–41592(BRL), 02–15477(BRL).

United States Bankruptcy Court, S.D. New York.

May 21, 2004.

Kaye Scholer LLP, by Arthur J. Steinberg, Brian E. Kriger, Heath D. Rosenblat, New York City, for Arthur Steinberg, Esq., ICA Trustee, in his capacity as Liquidating Agent & Manager of IBF Liquidating LCC and IBF Fund Liquidating LLC.

Michael R. McCray, Pine Bluff, AR, for Dillard–Winecoff, LLC.

Sullivan & Worcester LLP, by Matthew B. Giger, New York City, for Atlantic Bank of New York.

Schulte Roth & Zabel LLP, by Brian F. Moore, New York City, for the Liquidating LLC Committee.

## MEMORANDUM DECISION EXPUNGING CLAIMS 1709 AND 1712

BURTON R. LIFLAND, Bankruptcy Judge.

By convoluted and somewhat bizarre means, the claimant Dillard–Winecoff LLC ("Dillard"), seeks to undo the effects of a 1999 mortgage foreclosure proceeding previously settled in the Georgia courts.

IBF Liquidating LLC ("IBF LLC") and IBF Fund Liquidating LLC ("Fund LLC" and, together with IBF LLC, the "Liquidating LLCs"), by and through their manager and liquidating agent, Arthur J. Steinberg, Investment Company Act trustee ("ICA Trustee") of IBF Collateralized Finance Corporation ("CFC") and IBF VI–Secured Lending Corporation ("SLC" and, together with CFC, the "Funds") move for entry of an order and judgment (the "Dismissal Motion") dismissing proofs of claims Nos. 1709 and 1712 (the "Claims") filed by Dillard.[1] The Liquidating LLCs argue that the Claims should be dismissed based upon Dillard's failure to comply with discovery rules and procedures pursuant to, inter alia, rules 7029, 7033, 7034, 7041 and 9016 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") incorporating rules 29, 33, 34 and 45 of the Federal Rules of Civil Procedure ("FRCP") and rule 9020–1 of the Local Bankruptcy Rules for the United States Bankruptcy Court for the Southern District of New York ("Local Bankruptcy Rules"). The Liquidating LLCs *also* seek summary judgment under Bankruptcy Rule 7056, disallowing and expunging the Claims because they cannot be sustained on their face.

In its April 16, 2004 response, Dillard argues that the Liquidating LLCs' Dismissal Motion, at the current stage of discovery, is premature.[2] Dillard asserts that

---

1. The Liquidating LLCs also request an inquest hearing for reimbursement of fees and expenses pursuant to indemnity provisions in the Amended Loan Agreement, or other basis, and reserve rights under, inter alia, section 1927 of title 28, United States Code to recover

against either Dillard, Michael McCray, or both.

2. This is an inconsistent position for Dillard to be taking in light of Dillard's own March

discovery should proceed because a more developed record would demonstrate that genuine issues of material fact exist with respect to its Claims and therefore, the Dismissal Motion should be denied. However, having already been deluged with 20–30 pounds of papers submitted by Dillard and having sifted through the pertinent submissions of both parties, *I cannot agree* with Dillard that genuine issues of material fact exist with respect to the Claims; that the Dismissal Motion is premature and that Dillard's failure to comply with a host of Federal Rules is excusable.

█ As a preliminary matter, this Court notes that Dillard's submissions and general conduct before this Court and other courts have been replete with errors, typographical and grammatical blunders, appearances of inappropriate gamesmanship, failure to follow procedure, poor communication with its own counsel and with its adversaries, as well as issues of credibility. Dillard has suggested that the Court should treat Dillard as a "lay person" because "this is an unusual and complex financial transaction which involves nearly a $200 million bankruptcy estate *and* is Mr. McCray's first case as a licensed attorney." [3] Therefore, Dillard proposes that its filings be deemed "made in good faith." This Court is unaware of any such doctrine available to Dillard and/or its counsel. Moreover, contrary to Dillard's assertion that this Court in anyway countenanced such a notion at a hearing on August 28, 2003, the Court merely waived the requirement that corporations be represented by counsel for *that hearing only*. The Court

was clear in its direction at that hearing that Dillard obtain legal representation before continuing the contested matter. Numerous courts have instructed Dillard on several occasions that it was improper for Dillard to be represented pro se.[4] Thus, I find that Dillard's novel argument that it should be treated as a "lay person" is utterly without merit.

### Background

On June 7, 2002, while under investigation by the United States Securities and Exchange Commission (the "SEC"), the Funds and their parent, InterBank Funding Corporation ("IBF"), filed voluntary petitions for relief under title 11, United States Code (the "Bankruptcy Code"). On November 4, 2002, an affiliate, IBF Premier Hotel Group, Inc. ("IBF Hotel" and, with IBF and the Funds, the "Debtors"), filed its voluntary petition for relief under chapter 11. On July 23, 2002, the SEC filed a complaint against IBF, the Funds, and Simon A. Hershon (former chief executive officer), commencing an enforcement action in the District Court for the Southern District of New York (the "District Court"). *Securities and Exchange Commission v. IBF Collateralized Finance Corporation, et al.,* No. 02–CV–5713 (JSM) ("SEC Litigation"). On December 5, 2002, on motion of the SEC, the District Court entered an order (the December 5 Order) appointing Arthur J. Steinberg to act as the ICA Trustee for the Funds and their subsidiaries pursuant to the Investment Company Act of 1940, title 15, United States Code.

---

31, 2004 *Plaintiff's Motion For Partial Summary Judgment.*

**3.** On April 16, 2004, Mr. McCray finally submitted a pro hac vice motion to practice before this Court. That motion contains Mr. McCray's statements that he is familiar with the laws and rules of this Court and thus is in

direct conflict with his argument that Dillard be treated as a "lay person."

**4.** *See infra* note 8 (demonstrating a pattern of recidivism temporarily alleviated by retention of qualified counsel *who have* subsequently moved to withdraw from the proceedings).

On May 28, 2003, in the chapter 11 case, the ICA Trustee filed his proposed joint liquidating plan with respect to the Debtors (as amended, the "Plan") and related disclosure statement. On August 14, 2003, this Court entered an order ("the Confirmation Order"), confirming the Plan. The Plan provides for the transfer of the assets of the Debtors' estates to the Liquidating LLCs, which will be operated in a limited capacity over the course of the next five years and liquidated over time for the benefit of the Debtors' creditors—principally, thousands of individual investors who bought notes or other debt securities issued by the Funds. Under the Plan, approximately 30% is to be distributed to unsecured creditors of the Funds and less than 5% is to be distributed to unsecured creditors of IBF. The ICA Trustee is the designated Liquidating Agent under the Plan and is responsible for managing the wind-down of the Liquidating LLCs.

### The Winecoff Hotel and the Georgia Action

Dillard was formed for the purpose of acquiring and developing the Winecoff Hotel (the "Property") in Atlanta, Georgia.[5] In the early summer of 1998, Mr. Courtney Dillard, as Dillard's principal, contacted Brendan Sullivan of InterBank Brenner Brokerage Service, Inc. ("IBBS"), and Richard Armstrong of InterBank Mortgage Corporation ("IMC"), to discuss possible means to obtain acquisition financing for the Property.[6]

On June 26, 1998, several funds that have since merged into CFC (hereinafter also referred to, collectively, as "CFC"),[7] loaned approximately $1,800,000 (the "Loan") to finance the purchase of the Property. In connection with the Loan, IMC and Dillard entered into an Exclusive Advisory Agreement (the "Advisory Agreement"), whereby IMC became Dillard's exclusive agent for the purpose of identifying sources of financing for the proposed development of the Property. Jamion America Corporation ("Jamion"), the seller of the Property, carried an additional note of $750,000 (the "Note").

By the fall of 1998, Dillard defaulted on both the Loan and the Note. Sometime thereafter, Jamion, the junior lien holder on the Property, began foreclosure proceedings. On the morning of February 2, 1999, the day of the scheduled foreclosure sale of the Property, Dillard filed the first of its three dismissed chapter 11 cases in the Northern District of Georgia.[8] On

---

5. The Demm Group was the original entity that entered into negotiations with Jamion (defined hereinafter) to acquire the Property. Dillard was subsequently formed during the acquisition financing stages.

6. Neither IBBS nor IMC are owned by any of the Debtors.

7. IBF Participating Income Fund (PIF) and IBF Special Purpose Corporation II(SPC) both loaned money to Dillard. PIF and SPC were later merged into CFC. *Dillard is not,* as Dillard's papers suggest, *a protected investor/beneficiary under the Plan.* To the contrary, Dillard's status is that of a borrower tapping into the funds raised from investors to be used for business ventures.

8. Each of Dillard's three bankruptcy cases was dismissed because of Dillard's failure to follow appropriate procedure. The first bankruptcy case was dismissed because Dillard, as a corporate entity, *did not have counsel and could not represent itself pro se.* Case No. 99–61779(SWC)(N.D.Ga.). In the second bankruptcy case, the Bankruptcy Court directed Dillard to retain counsel. In his pro se response, Mr. Dillard argued that the second bankruptcy case was a continuation of the first, dismissed, bankruptcy case. The Court dismissed the second case because it was *not* a continuation of the first bankruptcy case *and because Dillard failed to obtain counsel.* Case No. 03–91743(MHW)(N.D.Ga.). In the third bankruptcy case, *the Bankruptcy Court again directed Dillard to obtain counsel.* In response, Michael McCray (Mr. McCray), a

May 19, 1999, the Georgia Bankruptcy Court lifted the automatic stay with respect to both Jamion and CFC, citing Dillard's failure to timely file a plan of reorganization and the lack of any prospect of confirming a plan. Accordingly, Jamion and CFC were able to continue the foreclosure. CFC bid in its secured claim and took title to the Property on July 6, 1999. Shortly thereafter, on August 4, 1999, Dillard's chapter 11 case was dismissed.

CFC transferred title of the Property to IMC by quitclaim deed on September 1, 1999. On September 2, 1999, IMC sold the Property to RBJF Atlanta, LLC ("RBJF"), now known as Kelco/FB Winecoff, LLC ("Kelco/FB"), by limited warranty deed. Neither Kelco/FB nor its predecessor RBJF is affiliated with the Debtors.

Subsequent thereto, Dillard filed an action in the Superior Court for Fulton County, Georgia, against PIF, SPC, IMC and IBBS (collectively, the "Georgia Defendants") on September 10, 1999, Case No. 1999–CV–13562 (Ga.Sup.Ct.) (the "Georgia Action"). In the Georgia Action, Dillard alleged that the Loan was made with the intention of causing Dillard to default on the loan and permit the Georgia Defendants to take title by foreclosure. As the victim of the alleged "loan to own" scheme, Dillard entreated that Court for equitable relief or, in the alternative, for damages under theories of intentional interference with contract, fraudulent lend-

ing scheme, wrongful disclosure, breach of fiduciary duty and breach of contract. Shortly thereafter, Dillard also filed a notice of lis pendens on the Property (the "Lis Pendens") on October 6, 1999.

On January 19, 2000, in the Georgia Action, CFC moved for summary judgment on Dillard's claims. CFC argued that the doctrines of judicial estoppel, res judicata and collateral estoppel precluded Dillard's claims as a matter of law because Dillard failed to schedule the claims, as set forth in the Georgia Action, as an asset of its chapter 11 estate in a previous bankruptcy case. Therefore, CFC argued, Dillard was precluded from asserting an inconsistent position in the subsequent proceeding. On April 5, 2000, the Superior Court entered summary judgment (the "Superior Court Decision"), in favor of the Georgia Defendants.

Dillard appealed the Superior Court Decision to the Georgia Court of Appeals. On July 16, 2001, the Appellate Court reversed the Superior Court Decision and on November 25, 2002, the Georgia Supreme Court affirmed. However, no ruling was ever made on any substantive claim brought by Dillard—the appeals in the Georgia Action were limited to the issue of whether or not Dillard's failure to include its Georgia Action claims on its schedule of assets prevented Dillard from asserting those claims against the Georgia Defendants under the doctrines of judicial estoppel, res judicata and collateral estoppel.[9]

25% owner of Dillard and an attorney admitted in New York (*but not in Georgia*), signed his name to the petition and submitted this as Dillard's amended filing. The Court dismissed the third bankruptcy and further ordered that Dillard be precluded from filing a subsequent petition under chapter 11 for one year. Case No. 03–80139 (N.D.Ga.).

9. On February 7, 2003, the successor to RBJF, Kelco/FB, voluntarily intervened in the Georgia Action seeking relief from the Lis

Pendens clouding title to the Property. On February 11, 2003, Kelco/FB filed, a motion for summary judgment and an emergency motion to cancel the Lis Pendens. The Superior Court ruled in favor of Kelco/FB and, by Order dated February 14, 2003, cancelled the Lis Pendens and declared Kelco/FB a bona fide purchaser. Not three hours after the hearing, Dillard filed the second of its three bankruptcy cases, which was ultimately dismissed. Then, on September 23, 2003, the

Before the Georgia Action could resume on the merits, however, the Debtors served Dillard with notice on February 11, 2003, that the Funds and their parent, IBF, had filed chapter 11 bankruptcy cases on June 7, 2002. Therefore, Dillard was stayed from proceeding with the Georgia Action.

On May 30, 2003, Dillard filed identical claims in the Debtors' chapter 11 cases, numbers 1709 and 1712, against CFC and IBF. Dillard's Claims each included a secured claim in the amount of $2,700,000 ("equitable claim to title") and an alleged priority claim in the amount of $2,737,187 (for "services performed" and "money loaned"). Nothing in the Claims, or in the documents attached to the Claims,[10] demonstrate how Dillard's Claims qualify as a secured or priority claim under sections 503, 506 or 507 of the Bankruptcy Code.

The ICA Trustee objected to Dillard's Claims in its July 10, 2003 *Omnibus Objection to Certain Claims for Which Debtors Are Not Liable* (the "Objection"). On August 25, 2003, Dillard filed a response in opposition to the ICA Trustee's Objection.

Then, on August 28, 2003, the morning of the hearing on the ICA Trustee's Objection, Dillard supplemented its response with an excessive amount of paper comprising the record of the Georgia Action and the appellate proceedings thereto. As impressive as the mountain of documents may have appeared, they did not address or respond to the ICA Trustee's Objection.[11] Moreover, consistent with his prior practice in Georgia, Mr. Dillard appeared at the hearing pro se in violation of the rule that corporations must be represented by counsel.[12] At the hearing, the Objection was adjourned to give Dillard an opportunity to obtain counsel and to allow the parties to engage in settlement discussions.

In the midst of ongoing adjournments of the hearing on the Objection, Dillard filed a motion seeking relief from the automatic stay on October 30, 2003 (the "Lift Stay Motion"). The Lift Stay Motion was filed by then, newly retained local counsel for Dillard, Stern, Lavinthal, Frankenberg & Norgaard, LLC ("Stern Lavinthal").[13] On

day before the hearing on Kelco/FB's summary judgment motion was to resume, Dillard filed its third bankruptcy case—again pro se. As noted, that case was also dismissed (with prejudice as to Dillard's ability to file a subsequent chapter 11 petition). *See supra* note 8.

10. Dillard simply attached copies of its Georgia Action complaint to each of the Claims.

11. In the supplement to its response, Dillard also stated its dismay at not being included on the Official Committee of Unsecured Creditors (Committee) and proffered a proposed *Unanimous Consent Order* adding Dillard to the Committee—despite the fact that the Plan had been confirmed two weeks earlier.

12. Mr. Dillard was obviously aware of this requirement, having learned it in the course of the bankruptcy cases he filed on behalf of Dillard.

13. Apparently, on September 2, 2003, Dillard served the ICA Trustee with a FRCP 11 sanc-

tions motion (Rule 11 Motion), asserting that the filing of the ICA Trustee's objection to the Claims was sanctionable: (i) for failure to conduct a reasonable investigation before filing objections to the Claims; (ii) for the frivolous filings and the false representations made in the objection; (iii) for false allegations and subjective bad faith contained in the objection; and (iv) based on an alleged duty to correct or withdraw the objections to the Claims. [Dismissal Motion Exhibit 17]. The Rule 11 Motion does not appear to have been filed with the Court. According to the ICA Trustee, subsequent to Stern Lavinthal's retention, the Rule 11 Motion was withdrawn. However, in Dillard's response to the Dismissal Motion, Dillard is again asserting that the ICA Trustee's conduct is sanctionable. This time however, Dillard cites section 1927 of title 28, United States Code, as the basis for sanctions and in an unfocused, vague manner, accuses the ICA Trustee of bad faith

December 3, 2003, this Court entered an order denying the Lift Stay Motion, finding that Dillard had failed to show cause.

Subsequently, the parties submitted a joint scheduling order to the Court on December 16, 2003 (the "Joint Order"), pursuant to which both parties made initial disclosures on January 7, 2004. According to the ICA Trustee, Dillard was contacted with regard to certain deficiencies with Dillard's initial disclosures on January 16, 2004. As a result, the parties mutually agreed to extend time to serve written discovery by 10 days and thereafter agreed to an additional extension of 8 days, equaling a total of eighteen 18 days. On February 13, 2004, the parties exchanged written discovery requests with responses due on March 4, 2004 under the Joint Order. The ICA Trustee responded timely, providing Dillard with responses on March 4, 2004. Dillard, however, failed to respond by the March 4, 2004 deadline and according to the ICA Trustee, on March 9, 2004, Dillard requested an extension. The ICA Trustee responded, proposed an extension and noted Dillard's default and untimely request. Dillard argues, however, that notwithstanding the Joint Order, under the FRCP it had 30 days to respond and asserts that the parties had mutually agreed to an extension of 26 days.

Dillard also failed to appear at the March 16, 2004 pre-trial (the "Pre–Trial"), as required pursuant to the Joint Order. In explanation for its failure to appear, Dillard contends that because the "entire discovery schedule had been purportedly moved back a total of 26 days by mutual consent of the parties," it was "under the reasonable belief" that the Pre–Trial had been rescheduled for April 3, 2004. If the parties had indeed agreed to adjourn the Pre–Trial from March 16, 2004 to April 3, 2004, the scheduled Pre–Trial actually would have been "moved back" 18 days— *not 26 days.*[14] Furthermore, this Court is at a loss as to how Dillard could have been "under the reasonable belief" that the Pre–Trial had been rescheduled for April 3, 2003 because *April 3, 2003 is a Saturday (a court reporter's day of rest).*

At the March 16, 2004 Pre–Trial, the attorney for the ICA Trustee represented that he had attempted to contact Dillard on March 15, 2004, regarding the Pre–Trial but had been unsuccessful. The ICA Trustee stated that it had numerous conversations with Dillard's local counsel, Mr. O'Boyle of Stern Lavinthal, but that Mr. O'Boyle was unable to contact his client. The ICA Trustee asserts that Mr. O'Boyle was advised that no continuance of the Pre–Trial had been consented to and that a representative of the ICA Trustee intended to appear.[15] As already noted, Dillard failed to appear or otherwise contact the Court regarding the matter. Conse-

behavior and vexatiously multiplying the proceedings.

**14.** It bears noting that some of Dillard's papers say the discovery schedule was pushed back 26 days, while some of Dillard's papers attest, and at the hearing on the Dismissal Motion Dillard's counsel stated, that the number was actually 18 days. In either case, documents submitted by both parties confirm the ICA Trustee's statement that, while the time for discovery may have been extended, the March 16, 2004 Pre–Trial hearing was *never* adjourned.

**15.** On March 24, 2004, Stern Lavinthal filed a motion to withdraw as counsel to Dillard, citing Dillard's failure to pay Stern Lavinthal's invoices and a lack of communication on Dillard's part. As the Bankruptcy Court in Dillard's third bankruptcy case stated, Inadequate communication appears to be the hallmark of this debtor [Dillard]. Case No. 03–80139 (N.D.Ga.)(Dec. 19 Hearing Transcript at p. 84).

quently, the Court noted Dillard's default. In addition, the ICA Trustee made an oral application to the Court, citing Dillard's abuses of the discovery process, for a stay of discovery in the proceeding through March 31, 2004, in order to permit the ICA Trustee an opportunity to file papers seeking relief related to Dillard's default and a pleading to dismiss the Claims on the merits. This Court granted the application and entered an order staying discovery on March 17, 2004 (the "March 17 Order").

Since the March 17 Order was entered, Dillard has filed numerous motions including: a motion for reconsideration, dated March 26, 2004, (the "Reconsideration Motion") respecting the Stay Order; [16] a motion for protective order, dated March 22, 2004 (the "Protective Motion"); a motion to compel discovery, dated March 22, 2004 (the "Discovery Motion"); as well as a motion for partial summary judgment, dated March 31, 2004 (the "PSJM," and collectively, the "Dillard Motions").

On March 31, 2004, upon the request of the ICA Trustee and upon consideration of the letter submitted by Dillard in opposition, this Court issued an order to show cause (the "OSC") that, inter alia, continued the stay of discovery and continued the Dillard Motions [17] "pending the Hearing and the Court's determination of the Dismissal Motion." On April 16, 2004, Dillard submitted its response to the Dis-

missal Motion and on April 22, 2004, the Liquidating LLCs filed their reply (the "Reply"). In the interim, however, notwithstanding this Court's stay of discovery pending determination of the Dismissal Motion, Dillard continued to serve discovery process in violation of the stay. [Reply Exhibits D–1, D–2 & D–3].

### Discussion

■ Initially I note that, despite Dillard's vague assertions of a deprivation of constitutional rights, Dillard's rights under the First and Fifth Amendments of the United States Constitution have not been violated. Dillard's right to free speech or publication has not been curtailed in any manner. In fact, Dillard's communication in this matter, both written and oral, has been overly profuse. Furthermore, Dillard has not demonstrated, or really even argued, that a deprivation of life, liberty or property has occurred in contravention of constitutional values. Dillard appears to argue that its due process rights have, in some way, been denied. However, I note that at all times Dillard has received sufficient notice and has been given more than ample opportunity to be heard. Dillard's constitutional arguments are makeweight and wholly without merit.

### The Claims

■ On their face, Dillard's Claims are defective. With regard to that portion of

---

**16.** Dillard, citing Local Bankruptcy Rule 9077–1, argues that the relief granted at the March 16 Hearing was improper because it was granted at the ex parte request of the ICA Trustee. The request, however, was not an ex parte application. Pursuant to Bankruptcy Rule 9013, relief was granted based upon an oral application in open court, at a proceeding for which Dillard had been properly served with notice. Dillard could have and should have appeared, or arranged for local counsel to appear, at the March 16, 2004 Pre–Trial. In light of the issues of credibility surrounding Dillard's explanation of its de-

fault, this Court had no qualms in granting the relief then requested.

**17.** Dillard's PSJM was filed on the same day the OSC was issued. Therefore, the OSC did not specifically contemplate the continuance of the PSJM. I find that a continuance of the PSJM until the Dismissal Motion is consistent with the intention of the OSC. However, because the issues in the PSJM are the same issues that are addressed in this memorandum decision is concerned, together with granting the Dismissal Motion, I find that the PSJM is without merit and is hereby denied.

the Claims based on an "Equitable Claim to Title," the Debtors do not own the Property. Nor do the Debtors have title to the Property in any manner. In 1999, CFC, a foreclosing mortgagee following the grant of stay relief, transferred title of the Property to IMC, which is not a debtor in these chapter 11 cases and is not an entity under the ICA Trustee's control pursuant to the December 5, 2002 Order appointing him or under the terms of the Plan.[18] IMC subsequently transferred title of the Property to Kelco/FB's predecessor, RBJF. Kelco/FB is a non-debtor third-party and is not an affiliate of the Debtors. Moreover, another Court has already cancelled Dillard's Lis Pendens against the Property. Therefore, in light of Dillard's complete failure to provide evidence to the contrary or to refute similar arguments in the Dismissal Motion, I find that portion of Dillard's claims premised upon an "Equitable Claim to Title" are not supportable and are hereby disallowed and expunged.

█ Similarly, that portion of the Claims filed as priority claims based on "services performed" and "money loaned" are equally insupportable. Dillard did not loan money to the Debtors at any time. Nor did Dillard provide any services to the Debtors. Furthermore, Dillard's proofs of claim fail to specify the required statutory basis for filing a priority claim and indeed, no such statutory basis exists under which Dillard can assert a priority claim. *See* 11 U.S.C. § 507 (2003)(priority claims include certain wage claims, some claims based on deposits on the purchase, lease or rental of property or services for personal use, claims for alimony, maintenance or child support, as well as some tax claims). Therefore, because Dillard has failed to demonstrate evidence to the contrary or to refute arguments such as these in the Dismissal Motion, that portion of Dillard's Claims filed as priority claims for "services performed" and "money loaned" is hereby disallowed and expunged.

Before addressing each of the claims asserted by Dillard in the Georgia Action, this Court notes that neither CFC nor the two predecessors of CFC that are defendants in the Georgia Action, PIF and SPC, had any employees. PIF and SPC, like CFC, were special purpose entities that were merely sources of financing for loans. Dillard has failed to set forth any viable causes of action against PIF, SPC or CFC. In addition, Dillard cannot sustain its Claim against IBF. Dillard's Claim against IBF is based upon Dillard's stated causes of action in the Georgia Action. However, *IBF is not a party to the Georgia Action.*

### Summary Judgment

FRCP 56(c), made applicable to bankruptcy proceedings by Bankruptcy Rule 7056, provides that summary judgment is proper "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving par-

---

18. Like IMC, IBBS is not a debtor in this chapter 11 case and is not under the control of the ICA Trustee. Dillard appears unable, or unwilling, to understand who are actually parties to this contested matter. As noted, two of the entities named as defendants in the Georgia Action, PIF and SPC, merged into CFC—a debtor in these chapter 11 cases. There are only four debtors in these chapter 11 cases and out of these four debtors, *only CFC is a defendant in the Georgia Action—IBF* is not a party in the Georgia Action. There are no co-defendants here. This is merely a claims objection proceeding regarding claims that Dillard filed against IBF and CFC. Moreover, Kelco/FB, is not a debtor in these chapter 11 cases, is not a non-debtor affiliate and is not a co-defendant in this contested matter, as Dillard imagines. Kelco/FB is a separate, independent entity that is the bona fide purchaser of the Property. [Dismissal Motion Exhibit 12].

ty is entitled to a judgment as a matter of law." FRCP 56(c); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Gallo v. Prudential Residential Servs.,* 22 F.3d 1219, 1223 (2d Cir.1994). Summary judgment is appropriate if, in light of the evidence presented, there is no genuine issue as to any material fact, and the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On a summary judgment motion, the moving party has the burden of demonstrating the absence of any genuine issue of material fact, and all inferences to be drawn from the underlying facts must be viewed in the light most favorable to the party opposing the motion. *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505 (1986); *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970); *United States v. Certain Funds on Deposit in Scudder Tax Free Inv. Account No. 2505103,* 998 F.2d 129, 131 (2d Cir.1993). Once the movant has made its showing, however, the burden of production shifts to the non-movant who must "go beyond the pleadings and by [its] own affidavits, or by the depositions, answers to interrogatories, and admissions on file, designate specific facts showing that there is a genuine issue for trial." *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (quoting FRCP 56(c)). The non-movant cannot defeat a motion for summary judgment by merely casting some metaphysical doubt on the moving party's assertions. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). The non-movant must present specific significant probative evidence supporting its case sufficient "to require a ... judge to resolve the parties' differing versions of the truth at trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 249, 106 S.Ct. 2505. There is no genuine issue for

trial if the record, taken as a whole, could not lead a rational trier of fact to find for the non-moving party. *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348. The moving party may obtain summary judgment by showing that little or no evidence may be found in support of the non-moving party's case. *Gallo,* 22 F.3d at 1223–24. *See also Quarles v. General Motors Corp.,* 758 F.2d 839, 840 (2d Cir.1985) ("the mere existence of factual issues—where those issues are not material to the claims before the court—will not suffice to defeat a motion for summary judgment"). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses[.]" *Celotex,* 477 U.S. at 324–25, 106 S.Ct. 2548.

Contrary to Dillard's assertions, the ICA Trustee can properly move for summary judgment. Summary judgment is appropriate where, as here, no issue of material fact exists and no court order dictates otherwise. In addition, this Court's issuance of the OSC permitted the Liquidating LLCs to file the Dismissal Motion, which included arguments for summary judgment. The Liquidating LLCs have appropriately asserted their right to move for summary judgment. In this proceeding, Dillard has utterly failed to meet its burden. *See Celotex,* 477 U.S. at 324, 106 S.Ct. 2548; *Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348.

*Intentional Interference With Contractual Relations*

 To support a cause of action for intentional interference with contractual relations under Georgia law, a plaintiff must demonstrate "(1) improper action or wrongful conduct by the defendant without privilege; (2) [that] the defendant acted purposely and with malice; (3) [that] the defendant induced a breach of a contractual obligation or caused a party or third

party to discontinue or fail to enter into an anticipated business relationship with the plaintiff; and (4) [that] the defendant's tortuous conduct proximately caused damage to the plaintiff." *Culpepper v. Thompson*, 254 Ga.App. 569, 562 S.E.2d 837, 840 (2002)(citing *Disaster Svcs. v. ERC Partnership*, 228 Ga.App. 739, 492 S.E.2d 526 (1997)).

■■■ The first element requires that the defendant be "a stranger to a contractual or business relation [or] is an intermeddler acting improperly *without privilege.*" *In re Hercules Automotive Products*, 245 B.R. 903, 910 (Bankr.M.D.Ga.1999)(emphasis added). Privilege is "a legitimate or bona fide economic interest of the defendant or a legitimate relationship of the defendant with the contract, which causes the defendant not to be considered a stranger, interloper, or meddler to the contract." *Culpepper*, 562 S.E.2d at 840.

In its Georgia Action complaint, Dillard contends that the Georgia Defendants interfered with the contractual relationship between Dillard and Jamion and that this alleged interference was improper and without privilege. However, as the senior lien holder,[19] the Georgia Defendants, including the predecessors to CFC, did indeed have a "legitimate or bona fide economic interest" in the Property and therefore, would not have acted as "intermeddler[s]" in the event the junior lien holder was contacted in order to protect CFC's loan position and collateral. A lender/senior lien holder and a seller participating in the financing as a junior lien holder would very likely communicate with each other, and such communication would be in the ordinary course of their business relationship. Clearly, if any ac-

tion was taken, the Georgia Defendants would have been acting "with privilege" and, as a consequence, Dillard's claim for intentional interference with contractual relations cannot succeed.

*Fraud*

■■■ Under Georgia law, to maintain a cause of action for fraud, the moving party must demonstrate five elements: "(1) false representation or omission of fact; (2) scienter; (3) an intent to induce the party alleging fraud to act or refrain from acting; (4) justifiable reliance; and (5) damages." *McEntyre v. Edwards*, 261 Ga.App. 843, 583 S.E.2d 889, 891 (2003); *see also Klusack v. Ward*, 234 Ga.App. 178, 507 S.E.2d 1, 2 (1998).

In the Georgia Action, Dillard alleged that it justifiably relied on false assertions regarding the procurement of financing under the Advisory Agreement. However, the Advisory Agreement was between Dillard and IMC, a non-debtor entity—*not CFC or IBF*. As already noted, neither CFC nor its predecessors, PIF and SPC, had any employees. If any fraud was indeed perpetrated against Dillard, it involved a non-debtor entity. Accordingly, Dillard's claim for fraud against CFC and/or IBF is not sustainable.

■■■ In addition, Dillard's final count for breach of contract (discussed below) further nullifies its right to sue under a theory of fraud. In *Stricker v. Epstein*, the Georgia Court of Appeals, in addressing a matter involving breach of contract, accounting fraud, violations of securities law, and breach of fiduciary duty, held that:

> [a] person who is fraudulently induced to enter into a contract cannot sue for

---

**19.** The collateral for the Loan was the Property. Jamion's Note was junior to InterBank's lien.

breach of that contract and for damages for fraud if the contract in question contains a merger clause, because the plaintiff cannot simultaneously affirm the contract which states that no representations were made and allege fraud based on such representations. *Stricker v. Epstein*, 213 Ga.App. 226, 444 S.E.2d 91, 93 (1994).

The Advisory Agreement, in Section 8 or, the "Miscellaneous" section, contains such a merger clause: "[t]his Agreement constitutes the entire agreement between the Developer [Dillard] and Advisor [IMC] and *supersedes* all prior discussions, negotiations and agreements whether oral or written." [Dismissal Motion Exhibit 3]. The Advisory Agreement also provides that "[t]his Agreement shall be governed by the laws of the State of Georgia." Under *Stricker v. Epstein*, because the Advisory Agreement includes the merger clause, Dillard's claim for fraud cannot succeed. Moreover, to the extent that Dillard asserts a claim for fraud based on an alleged "lend/loan to own" conspiracy, Dillard has made no showing that such tort exists under Georgia law.

Finally, Dillard's case for fraud also fails because Dillard's complaint in the Georgia Action fails to plead fraud with sufficient particularity. Dillard's allegations are too few and too general to satisfy the pleading requirement for fraud. *See* OCGA § 9–11–9(b); *see also Moore v. Bank of Fitzgerald*, 225 Ga.App. 122, 483 S.E.2d 135, 140 (1997)(denying consideration of fraud theory where proponent of theory failed to set forth, with sufficient specificity, the basis for the allegation). For this reason, as well as the reasons already stated, Dillard cannot sustain a prima facie case for fraud.

*Wrongful Foreclosure*

■ Wrongful foreclosure is a tort that "exists [as] a statutory duty ... to exer-

cise fairly and in good faith the power of sale in a deed to secure debt [, and] breach of this duty is a tort compensable at law." *Boaz v. Latson*, 260 Ga.App. 752, 580 S.E.2d 572, 577 (2003).

Dillard argues that the Property was wrongfully foreclosed because: (i) IBF purportedly operated an illegal investment company and purportedly engaged in securities fraud; (ii) IBF purportedly fraudulently induced the June 26, 1996 Loan, which purportedly violated Georgia usury laws; (iii) the Loan was purportedly an illegal investment contract; (iv) that the lawful holder of the Loan was purportedly Atlantic Bank of New York and it failed to properly notify Dillard of the default, it failed to properly publish the foreclosure notice in the newspaper and it failed to properly conduct the foreclosure sale. [Response at p. 49].

*(i) & (iii) Dillard's Investment Contract Theory*

■ Initially, I note that this is the first time Dillard has made this argument. Dillard did not assert this argument in the Claims or in its complaint in the Georgia Action, nor did Dillard raise the issue when it opposed the lift stay motion in its first bankruptcy case. The bar date for claims in these cases has already passed and accordingly, Dillard's new "claim" is barred. However, even on the merits, Dillard's new theory would not succeed.

■ Dillard's broad assertion that the mortgage note for the Loan was an investment contract is incorrect. Dillard's attempt to portray itself as an investor is misplaced. Dillard did not invest money in a common enterprise with CFC or IBF, nor with any InterBank entity. Instead, CFC loaned money to Dillard and Dillard, as a borrower, defaulted on the Loan. *Cf. SEC v. W.J. Howey Co.*, 328 U.S. 293, 301, 66 S.Ct. 1100, 90 L.Ed. 1244 (1946)(invest-

ment contract does not exist except in situations where a party *invests* money "in a common enterprise with profits to come solely from the efforts of others."). Moreover, even assuming that Dillard's investment contract theory had merit, securities fraud claims would normally be subordinated under Bankruptcy Code section 510(b) and would receive no distribution under the Plan. *See Weissmann v. Man Capital Corp. (In re Pre–Press Graphics Co.)*, 307 B.R. 65 (N.D.Ill.2004)(supporting a broad interpretation of section 510(b)).

*(ii) Usury Theory*

Dillard argues that the rate of interest charged on the CFC Loan was usurious under Georgia law and, thus, the note was "illegal and void as a matter of law ..." [Response at p. 54; PSJM at pp. 15–16]. Under Georgia law, the allowable rate of interest is 5% *per month* on loans above $3,000, up to a maximum of 60% (5% × 12 months). O.C.G.A. § 7–4–18. Dillard contends that the rate of interest on the Loan was 40%. Even if true, this rate would be well within the allowable rate under Georgia law. It is contended in response that the actual interest rate charged, in any event, was 15% per annum plus a 5% origination fee upon a $1.8 million loan. [Dismissal Motion Exhibit 46].

*(iv) Improper Party Theory*

▪▪▪ Dillard also argues that Inter-Bank [20] was not the proper party to foreclose on the Property. Dillard asserts that the Atlantic Bank of New York ("Atlantic Bank") was the proper party to foreclose and points to a document evidencing a collateral assignment. That document relates to the January 1999 transaction between IBF and Atlantic Bank, whereby IBF borrowed $750,000 from Atlantic

Bank, executed a one-year term note on account of the loan and collateralized the loan with the CFC Loan. However, this was only a collateral assignment. CFC never assigned its title to, nor its rights or interest in the Property to Atlantic Bank. Furthermore, Atlantic bank was paid in full and never exercised any remedies with respect to its collateral, the Property. Moreover, because it was only a collateral assignment and not an absolute assignment, Atlantic Banks' collateral interest would have attached to any proceeds from a sale and would not have impeded CFC's decision to foreclose/sell.

Therefore, CFC was the proper party to foreclose on the Property. Moreover, the foreclosure was conducted pursuant to an Order of the Georgia bankruptcy court granting relief from the automatic stay, and in accordance with Georgia law.

*Breach of Fiduciary Duty*

▪▪▪ Under Georgia law, to maintain a cause of action for breach of fiduciary duty the moving party must demonstrate that a confidential relationship existed. *Albee v. Krasnoff,* 255 Ga.App. 738, 566 S.E.2d 455, 459 (2002)("Under OCGA § 23–2–58 a confidential relationship arises where one party is so situated as to exercise a controlling influence over the will, conduct, and interest of another or where, from a similar relationship of mutual confidence, the law requires the utmost good faith, such as the relationship between partners, principal and agent, etc.").

Dillard contends that by virtue of the Advisory Agreement, or a combination of the Advisory Agreement and mortgagor/mortgagee relationship, a fiduciary relationship was created and that a fiduciary

---

**20.** Actually, CFC was the party that foreclosed on the Property. Dillard, in its Response, alleges various causes of action against the InterBank Companies and/or InterBank, terms it fails to define.

duty was owed to Dillard. First, the language of the Advisory Agreement does not create a confidential relationship. Second, the Advisory Agreement was signed by a nondebtor entity. Neither CFC nor IBF are parties to the Advisory Agreement.

■ Dillard asserts, in the alternative, that a combination of the Advisory Agreement with IMC and the mortgagor/mortgagee relationship between CFC and Dillard somehow creates a fiduciary relationship. First, as noted, the parties to the Advisory Agreement and to the Loan are different entities. Second, the corresponding characteristics of a mortgagor/mortgagee relationship negate a fiduciary relationship. In fact, by definition, a mortgagor and mortgagee are very likely to have adverse/opposite positions and are often in complete conflict (i.e., foreclosure proceedings). *See Moore v. Bank of Fitzgerald,* 483 S.E.2d at 139 (explaining that lender/borrower or mortgagor/mortgagee relationships do not form confidential relationships); *see also Russell v. Barnett Banks, Inc.,* 241 Ga. App. 672, 527 S.E.2d 25, 26–27 (1999) (same). Finally, no confidential relationship is formed in a mortgagor/mortgagee relationship "merely because the [borrower] had advised with, relied upon, and trusted the [lender] in the past." *Russell,* 527 S.E.2d at 26. In sum, Dillard's breach of fiduciary duty theory is not sustainable.

### Breach of Contract

■ Dillard asserts that the InterBank Companies [21] breached their contractual obligations under the Advisory Agreement and the Loan, and, as a result, has been damaged. First, the Debtors are not parties to the Advisory Agreement. Second, Dillard fails to plead any specific alleged

breach. Third, the alleged breach of the Loan, in the total absence of any specific allegations by Dillard, is refuted by the fact that CFC advanced the funds in accordance with the loan documents, as evidenced by the deed to secure debt, and by the fact that Dillard took title to the property in June of 1998. [Dismissal Motion Exhibit 2]. Consequently, Dillard has failed to demonstrate any breach on the part of the Debtors under either the Advisory Agreement or the Loan.

### Rule 7056–1 and the Lack of Material Facts as to a Genuine Issue

■ Local Bankruptcy Rule 7056–1(b)–(d) provides as follows:

> Papers opposing a motion for summary judgment shall include a separate, short, and concise statement of each material fact as to which it is contended that there is a genuine issue to be tried. All material facts set forth in the statement required to be served by the moving party shall be deemed admitted unless controverted by the statement required to be served by the opposing party. Each statement of material fact by a movant or opponent must be followed by citation to evidence which would be admissible.

Local Bankruptcy Rule 7056–1(b)–(d) (2001). *See also* Local Rules of the United States District Courts for the Southern and Eastern Districts of New York 56.1.(b)–(d) (2003).

Dillard's Response is a poorly concocted cut-and-paste hodgepodge of its previous filings. Dillard has filed a blunderbuss of purported legal theories in its Response, many of which are inapplicable to the present proceeding or just plain illogical, in an apparent attempt to strike upon some win-

21. *See supra* note 20.

ning argument. Most fatal to its position, however, is the fact that Dillard has failed to file the required response to the Liquidating LLCs' 7056–1 statement.

As a result of Dillard's failure to controvert any of the facts therein, the Liquidating LLCs' 7056–1 statement of facts is deemed admitted. *Baker v. Dorfman*, 239 F.3d 415, 422 (2d Cir.2000)(citing *Gubitosi v. Kapica*, 154 F.3d 30, 31 n. 1 (2d Cir. 1998)); *Tullo v. City of Mount Vernon*, 237 F.Supp.2d 493, 494 n. 1 (S.D.N.Y.2002); *Sadler v. Moran Towing Corp.*, 204 F.Supp.2d 695, 696 (S.D.N.Y.2002); *See also O'Brien v. Teri (In re O'Brien)*, 299 B.R. 725, 727 (Bankr.S.D.N.Y.2003)(movant's statement of facts deemed admitted where party opposing summary judgment failed to submit required response under Local Rule 7056–1); *Sanders–Langsam Tobacco Co., Inc. v. Chemical Bank (In re Sanders–Langsam Tobacco Co., Inc.)*, 224 B.R. 1, 7 (Bankr.E.D.N.Y.1998)(accord); *Novartis Corp. v. Luppino (In re Luppino)*, 221 B.R. 693, 695–96 (Bankr.S.D.N.Y. 1998)(where party opposing summary judgment failed to controvert movant's 7056–1 statement of facts, movant's facts were deemed admitted and summary judgment was granted). Therefore, inter alia, because the Liquidating LLCs' statement of facts are deemed admitted, there are no disputed issues of fact to preclude summary judgment.

### Dismissal of Claims

■ In addition to the reasons set forth above, the expungement of the Claims is appropriate due to Dillard's continual failure to comply with the FRCP, the Bankruptcy Rules, as well as the Local Rules. FRCP 41(b) provides:

> [f]or failure of the plaintiff to prosecute or to comply with these rules or any order of the court, a defendant may move for dismissal of an action or of any claim against the defendant.

Unless the court in its order otherwise specifies, a dismissal under this subdivision . . . operates as an adjudication on the merits.

FRCP 41(b).

■ When determining if involuntary dismissal is appropriate pursuant to Bankruptcy Rule 7041, courts consider five factors: "(1) the duration of the plaintiff's failures; (2) whether the plaintiff had noticed that further delays would result in dismissal; (3) whether the defendant is likely to be prejudiced by further delay; (4) a balancing of the need to alleviate court calendar congestion with a party's right to due process; and (5) the efficacy of lesser sanctions." *Madison–Onondaga Corp. & Nappi v. Kanaley (In re Kanaley)*, 241 B.R. 795, 800–01 (Bankr.S.D.N.Y. 1999).

Dillard's failure to comport with rules and procedure of practice, as well as the discovery process, has been virtually uninterrupted since the beginning of its involvement in the Debtors' chapter 11 cases. Indeed, Dillard's discovery abuses are extensive. Dillard violated Bankruptcy Rule 7033 by serving non-parties with interrogatories. Dillard failed to comply with two provisions of the Court's Joint Order: Dillard failed to timely respond to the ICA Trustee's written discovery; and, Dillard failed to appear at the scheduled pre-trial conference (or make any attempt to contact the Court regarding the matter). Dillard violated Bankruptcy Rule 9016, by issuing subpoenas and document requests through Mr. McCray, although Mr. McCray is an attorney knowingly not admitted before this Court. Mr. McCray issued subpoenas on non-parties located more than 100 miles outside the district. Dillard failed to serve copies of its non-party submissions on the ICA Trustee, even though Dillard named the ICA Trustee thereon.

Dillard's improper discovery practice has continued, despite being on notice of a stay of discovery through the March 17 Order, OSC and the Dismissal Motion. Despite the stay, on April 1, 2004, Mr. McCray circulated a new deposition and discovery schedule to counsel for the ICA Trustee and continued to press service of subpoenas. Dillard's new subpoenas, dated March 30, 2004, violated the March 17 Order, which stayed discovery until April 1, 2004.

Although the stay of discovery was further extended pursuant to the OSC, Dillard attempted, on three occasions (April 2nd, 7th, and 8th), to serve subpoenas on Robert Porco (a former employee of a non-debtor affiliate), in disregard of the stay.[22] On the first two attempts to serve subpoenas, counsel for the ICA Trustee refused to accept and notified Dillard's process server that discovery was stayed. On the third occasion, the process server attempted a "drop and run"-type service of the subpoena. Counsel to the ICA Trustee returned this subpoena Dillard and again informed Dillard of the stay of discovery.

The ICA Trustee is not the only party complaining of Dillard's improper discovery practices. Dillard utilized the court process to inappropriately importune third parties under cover of this Court. Three non-parties have objected to Dillard's discovery tactics and have specifically pointed out that these requests violated the OSC. [Reply Exhibit D1–D3].[23] Therefore, in ad-

dition to the more substantive grounds already discussed, Dillard's repeated discovery abuses and failure to comport with the Local Bankruptcy Rules, the Bankruptcy Rules, as well as the FRCP, I find it appropriate to dismiss Dillard's Claims and consider appropriate sanctions.

### Conclusion

For all of the reasons set forth above, Dillard's Claims are hereby disallowed and expunged in their entirety and Dillard's PSJM having been found to be without merit is denied. Furthermore, the parties are instructed to consult with chambers for a date with respect to an inquest hearing on the requested sanctions.

---

**22.** Dillard re-issued subpoenas, despite the fact that pursuant to FRCP 45(a)(3), Mr. McCray is not an attorney admitted to practice before this Court and is therefore, not qualified to act on behalf of the Court.

**23.** An attorney for Atlantic Bank appeared at the hearing on the Dismissal Motion and stated that Atlantic Bank was served with interrogatories, as well as two subpoenas, after Dillard was on notice that discovery was stayed. Atlantic Bank's representative further

complained on the record as to the discovery abuses visited upon his client and the President of Atlantic Bank who, inter alia, refused to produce his personal tax returns dating back ten years or so. [Dismissal Motion Hearing Transcript at 73–77]. Annexed to this memorandum decision is an appendix of communications, which were accompanied by objections, of non-party witnesses to the improper invocation of discovery and subpoena power by Michael McCray.