**In re INTERBANK FUNDING CORP. SECURITIES LITIGATION**

No. CIV.A. 02–1490(JDB).

United States District Court, District of Columbia.

Aug. 9, 2004.

Adam T. Savett, Donald J. Enright, Tracy D. Rezvani, Finkelstein, Thompson & Loughran, Washington, DC.

Theodore Sonde, Michael Martinez, Crowell & Moring, LLP, Washington.

Adam S. Fels, David M. Brodsky, Jeff G. Hammel, DeMaurice F. Smith, Julia M. McLaren, Latham & Watkins, Washington.

## MEMORANDUM OPINION

BATES, District Judge.

This is an as-yet uncertified class action in which plaintiffs Monica Belizan and Dr.

William Prather ("Belizan" and "Prather," or "plaintiffs") assert a variety of securities law claims relating to their investments in Interbank Funding Corporation ("IBF"). Between 1997 and 2002, IBF and its subsidiaries issued debt securities in several investment funds totaling $195 million. Plaintiffs claim that the funds amounted to a Ponzi scheme: proceeds from later fund offerings were allegedly used to make interest payments to earlier investors.

The case comes before the Court on motions to dismiss by defendants CIBC World Markets Corp. ("CIBC"), a brokerage firm that sold some IBF securities, and Radin, Glass & Co., LLP ("Radin"), IBF's auditor. Plaintiffs contend that CIBC and Radin violated Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78j(b) ("Section 10(b)"), and Exchange Act Rule 10b–5, 17 C.F.R. § 240.10b–5, by willingly participating in the promulgation of misleading disclosures regarding the funds. Additionally, plaintiffs contend that Radin's conduct violated Section 11 of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77k ("Section 11"). A purported subclass of the plaintiffs asserts that CIBC violated sections 12(a)(1) and (2) of the Securities Act, 15 U.S.C. § § 77*l*(a)(1) & (2) ("Section 12(a)(1)" and "Section 12(a)(2)"). The Court concludes that none of these claims can proceed in the face of the demanding pleading standards applicable in securities cases, and accordingly grants the motions to dismiss.

## BACKGROUND

IBF was organized in 1996 by Simon A. Hershon[1] as a distressed loan outfit. *See* Consol. Am. Compl. ("Compl.") ¶ 20. Its business plan was ostensibly to pool capital into funds that would invest in under-performing loans and, after restructuring or otherwise rehabilitating the loans, sell them at a profit. The funds also invested in IBF-affiliated hotel development and industry consolidation ventures. In all, IBF organized seven funds between 1996 and 1999 (referred to herein as "Fund I," etc.).[2] Funds I through IV and Fund VII offered notes under various private placement memoranda. Compl. ¶ 15.[3] Each of these funds issued five-year notes bearing interest at rates between 8 and 12 percent annually, plus an additional variable interest payment tied to the respective fund's gross profits. *Id.* Both IBF and CIBC allegedly made private placement memoranda available to interested investors. Compl. ¶ 28. On September 20, 2000, and March 26, 2001, Prather allegedly purchased IBF securities through CIBC after being solicited by a CIBC broker. CIBC Mot. to Dismiss, App. 1. Belizan claims to

1. Pursuant to numerous extensions of time requested with plaintiffs' consent, Hershon, a defendant in this case, has not yet answered the Complaint. Neither IBF nor any of its subsidiaries is a party to this action.

2. In 2000, IBF redeemed Fund I's $2.5 million in outstanding notes. In 2001 and early 2002, IBF merged Funds II, III, and IV into Fund VII, which is also known as the IBF Collateralized Finance Corporation ("CFC"). Thus, today only Funds V, VI, and VII remain. Compl. ¶ 15.

3. "Fund I offered notes under a private placement memorandum dated February 16, 1996.

Fund II offered notes under a private placement memorandum dated January 21, 1997. Fund III offered notes under a private placement memorandum dated April 10, 1998. Fund IV offered notes under private placement memoranda dated February 17, 1998, February 12, 1999, February 15, 2000 and supplemental private placement memoranda dated November 7, 2000, July 5, 2001 and October 30, 2001." Compl. ¶ 15. Throughout the Complaint, plaintiffs refer to all these memoranda simply as "the Offering Materials." Compl. ¶ 27.

have purchased IBF securities sometime between July 26, 1999, and June 7, 2002, the purported Class Period. *See* Compl. ¶¶ 1, 6.

During that time, allege plaintiffs, IBF routinely repaid investors by shuffling money between its various funds. Compl. ¶ 35. To do this, it transferred loan assets between funds at par value, "meaning that the acquiring fund paid the selling fund all principal, interest and fees outstanding, without regard to the value and performance status of the underling loans." *Id.* As an example, plaintiffs allege that sometime "in 2000" IBF caused Fund VII to acquire about forty percent of Fund I's portfolio for cash to allow Fund I to pay its noteholders. Compl. ¶ 37. Generally accepted accounting principles ("GAAP") obliged IBF to disclose such material related-party transactions. Nonetheless, "other than generic disclosures saying that, from time to time, the IBF Funds acquire loans from one another," this and other inter-fund transfers were not properly reported in IBF's private placement memoranda.[4] *See* Compl. ¶ 38.

CIBC allegedly informed potential and actual purchasers of IBF securities, including Prather, that it had conducted extensive due diligence investigations into IBF's business practices. Compl. ¶ 96; *see also* Compl. ¶ 90 ("Prior to signing the selling agreement [with IBF], CIBC Oppenheimer conducted due diligence for approximately two-years [*sic*]. This due diligence including [*sic*] a review of financial statements; meetings with IBF Securities management including all of the top executives and senior management in the District of Columbia and New York; and reviews of loan files."). Plaintiffs' claim is that, if CIBC did in fact perform a thorough due diligence investigation, it "must have obtained knowledge" of IBF's inter-fund transfers and noticed their omission from the Offering Materials. Compl. ¶ 97.. CIBC was allegedly motivated to withhold what it knew from its clients because it was to receive nine percent of the gross sale price of each unit of IBF securities it sold, plus a pro-rata share of IBF's gross annual profits. Compl. ¶ 32. Thus, say plaintiffs, CIBC became a willing participant in the promulgation of misleading disclosures. CIBC supplied its clients with IBF materials and management presentations that it must have known were false or misleading as to the Funds' cash flow, ability to pay interest, and loan losses.

Meanwhile, Radin allegedly overlooked IBF's malfeasances and rendered unqualified audit reports during the relevant period. *See* Compl. ¶¶ 61–63. According to former IBF insiders interviewed by plaintiffs, Radin personnel spent up to four weeks annually at IBF's Washington, D.C. offices performing audits and reviews for the opinions published in IBF's financial

---

4. The Complaint states that the Offering Materials were *as a whole* materially false and misleading because they "a) concealed loan losses and non-performing loan losses and non-performing loans, and their impact on the Funds' income and balance sheet; b) misrepresented and concealed the fact that the bulk of IBF's debt service payments were paid for through inter-fund transfers, wherein the IBF Funds used newly raised cash from later offerings to pay the debt service on earlier offerings, in the manner of a Ponzi scheme; and c) misrepresented and concealed the fact that the moneys raised through each successive offering were destined for inter-fund transfers to be used to pay off noteholders from prior offerings, and not to purchase business assets for the purpose of generating revenues and cash flows for the funds doing the offering." Compl. ¶ 45; *See also* Tr. of Mot. Hr'g of Jul. 20, 2004 ("1st Tr.") at 30–31 ("the registration statements, each of them and in the aggregate, were materially false and misleading at the time they were filed .... as a whole they were misleading by omission").

statements and offering materials. Compl. ¶ 66. Plaintiffs charge Radin with knowing, or recklessly failing to know, that IBF's failure to disclose its purchases of bad loans were materially misleading. *See* Compl. ¶ 71. According to plaintiffs, Radin's reports, which did not expose IBF's inter-fund transfers, were included in at least eleven SEC filings between 1999 and 2002. Compl. ¶ 64. The impact of these omissions was allegedly material because the omissions obscured significant fund losses. Radin was paid audit fees ranging from $10,000 to $15,000 per fund and ultimately $50,000 to $100,000 per year in aggregate fees. Compl. ¶ 67.

Aside from their allegations about IBF's inter-fund transfers, plaintiffs charge in general that IBF's offering memoranda contained materially false and misleading maturity statistics. These gave the misimpression that the loans in at least one of IBF's portfolios turned over more frequently than they actually did. *See* Compl. ¶¶ 81–83. A stock of short-term loans would suggest a more stable investment than the stagnant pool of poor performers that the IBF funds allegedly contained. The Complaint also asserts that IBF failed to disclose the methodology it used to estimate the value of the collateral for its loans. As an example, plaintiffs cite a Fund VII report dated September 30, 2001, that supplied a 146–percent collateral coverage statistic for the Fund. Plaintiffs allege that Radin knew or was reckless in not knowing that the failure to disclose the lack of methodology was materially misleading given the apparent precision of that statistic. Compl. ¶ 87.

Throughout 2001, the SEC conducted an inquiry into allegations that IBF operated as a Ponzi scheme. The inquiry led to a private order of investigation and, on December 17, 2001, the SEC requested that all new offering proceeds from IBF Funds be deposited in an escrow account. Compl. ¶ 25. Incoming monies were thus not available for new investments or to service the debt from prior offerings. Sometime in January 2002, an IBF executive allegedly informed CIBC that IBF was the subject of an SEC investigation. Compl. ¶ 31. Radin also purportedly became aware of the SEC investigation some time in January 2002. Compl. ¶ 72 IBF ceased offering securities on January 31, 2002, and filed for bankruptcy that June. On July 23, 2002, the SEC filed a complaint against IBF, Funds VI and VII, and Hershon in the United States District Court for the Southern District of New York. *See SEC v. IBF Collateralized Finance Corp.*, 2002 WL 32081630, 2002 U.S. LEXIS (S.D.N.Y. Dec. 6, 2002) (order under granting partial summary judgment in favor of the SEC and appointing a trustee pursuant to the Investment Company Act, 15 U.S.C. § 80a–41(d)); *In re InterBank Funding Corp.*, 310 B.R. 238 (Bankr. S.D.N.Y.2004).

## *ANALYSIS*

### A. Applicable Legal Standard

A motion to dismiss pursuant to FED.R.CIV.P. 12(b)(6) will not be granted unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *see also Haynesworth v. Miller*, 820 F.2d 1245, 1254 (D.C.Cir.1987). Generally speaking, all that the Federal Rules of Civil Procedure require of a complaint is that it contain " 'a short and plain statement of the claim' that will give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests." *Conley*, 355 U.S. at 47, 78 S.Ct. 99. However, where fraud is alleged, the circum-

stances constituting fraud must be stated with particularity. FED. R. CIV. P. 9(b).

The Private Litigation Reform Act of 1995, 15 U.S.C. § 78u–4 ("PSLRA"), imposes additional pleading requirements on plaintiffs is securities cases. First, the statute requires that,

> in any private action arising under this chapter in which the plaintiff may recover money damages only on proof that the defendant acted with a particular state of mind, the complaint shall, with respect to each act or omission alleged to violate this chapter, state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.

15 U.S.C. § 78u–4(b)(2); *see also In re Digital Island Sec. Litig.,* 357 F.3d 322, 328 (3d Cir.2004) ("In requiring a 'strong inference of scienter, the PSLRA alters the normal operation of inferences under FED.R.CIV.P. 12(b)(6).' "). Second, the PSLRA requires that where a plaintiff alleges that a defendant made an untrue statement of material fact or omitted to state a material fact necessary to make the statements, in light of their circumstances, not misleading:

> the complaint shall specify each statement alleged to have been misleading, the reason or reasons why the statement is misleading, and, if an allegation regarding the statement or omission is made on information and belief, the complaint shall state with particularity all facts on which that belief is formed.

15 U.S.C. § 78u–4(b)(1).

## B. Claims under Section 10 of the Securities Act

■ Plaintiffs contend that CIBC and Radin violated Section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder by participating in the dissemination of materially false and misleading information regarding the IBF Funds. Section 10(b) makes it unlawful

> to use or employ, in connection with the purchase or sale of any security ..., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [Securities Exchange] Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 specifies the following actions among the kinds of behavior proscribed by Section 10(b):

> [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statement made, in light of the circumstances under which they were made, not misleading.

17 C.F.R. § 240.10b–5. To make out a cause of action under Section 10(b) and Rule 10b–5, a plaintiff must allege that each defendant (1) made a material misstatement or omission of a material fact, (2) with "scienter," (3) in connection with the purchase or sale of a security, (4) upon which the plaintiff reasonably relied, and (5) that plaintiff's reliance was the proximate cause of its injury. *See Kowal v. MCI Communications Corp.,* 16 F.3d 1271, 1276 (D.C.Cir.1994).

The requirement that a Section 10(b) plaintiff allege scienter—or "intent to deceive, manipulate or defraud"is well settled. *See Ernst & Ernst v. Hochfelder,* 425 U.S. 185, 193, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *Kowal,* 16 F.3d at 1276; *Novak v. Kasaks,* 216 F.3d 300, 306 (2d Cir.2000); *In re Silicon Graphics, Inc. Sec. Litig.,* 183 F.3d 970, 975 (9th Cir. 1999). As in *Novak,* however, this case "pertains not to the scienter requirement itself, but rather to the pleading requirement for scienter in the securities fraud context." 216 F.3d at 306. The courts of

appeals have diverged over the precise contours of the scienter pleading requirement following enactment of the PSLRA. The Third Circuit has held that the PSLRA effectively adopts the Second Circuit's pre-PSLRA requirement that plaintiffs allege facts giving rise to "a strong inference of fraudulent intent." *Acito v. IMCERA Group, Inc.*, 47 F.3d 47, 52 (2d Cir.1995); *see In re Advanta Corp. Sec. Litig.*, 180 F.3d 525 (3d Cir.1999). Under that standard, a plaintiff could meet his or her burden at the pleading stage by "(a) alleging facts to show that defendants had both motive and opportunity to commit fraud or (b) by alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir.1994). Other courts have held that the statute strengthens the old Second Circuit standard by rejecting the simple pleading of motive and opportunity. *See Bryant v. Avado Brands, Inc.*, 187 F.3d 1271, 1283 (11th Cir.1999); *In re Silicon Graphics*, 183 F.3d at 975; *In re Comshare, Inc. Sec. Litig.*, 183 F.3d 542, 550–51 (6th Cir.1999). The Second Circuit itself purported in *Novak* to adopt "a middle ground," concluding "that the PSLRA effectively raised the nationwide pleading standard to that previously existing in this circuit," but that "Congress's failure to include language about motive and opportunity suggests that we need not be wedded to these concepts in articulating the prevailing standard." 216 F.3d at 310. The D.C. Circuit has not spoken to the issue.[5]

■ Plaintiffs have failed to plead scienter under any of the prevailing standards, and thus this Court need not elect among them to resolve this case. The gist of plaintiffs' scienter allegation is that CIBC and Radin, although having access to materials revealing the problems, let IBF's misstatements and omissions slide because they expected to reap sizeable fees from IBF. *See* Compl. ¶¶ 32, 65, 66. That profit motive, coupled with the alleged GAAP violations that occurred at IBF—which CIBC and Radin "must have" noticed—is admittedly the basis of plaintiffs' scienter allegation. Tr. of Add'l Mot. Hr'g of Jul. 30, 2004 ("2d Tr.") at 40. Of course, were plaintiffs' theory correct, all GAAP violations of a certain magnitude would give rise to a cause of action under Section 10(b) and Rule 10b–5 against an issuer's brokers and accountants. But that is not the law. *See Fisher v. Offerman & Co., Inc.*, 1996 WL 563141, at *7 (S.D.N.Y. Oct.2, 1996) ("[A]n underwriter's alleged motive to earn its underwriting fees is not alone sufficient to sustain a strong inference of fraudulent intent. If it were, every ... investment advisor whose compensation or commission depended upon the completion of [a challenged transaction] would have a motive to commit fraud."). Rather, courts have rejected motive-and-opportunity allegations of scienter anchored merely in a defendant's profit motive, requiring instead at least some demonstrable claim of deceptive intent. *See In re Digital Island*, 357 F.3d at 331–32; *In re Baan Co. Sec. Litig.*, 103 F.Supp.2d 1, 20 (D.D.C.2000) (the fact that defendants "wanted to maintain their positions

5. However, in the context of an action by the SEC for a civil money penalty, the Court of Appeals has recently confirmed that "extreme recklessness" is sufficient to satisfy the scienter requirement for aiding and abetting liability. *See Howard v. SEC*, 376 F.3d 1136, 1144 (D.C.Cir.2004). Extreme recklessness "may be found if the alleged aider and abettor encountered 'red flags,' or 'suspicious events creating reasons for doubt' that should have alerted him to the improper conduct of the primary violator." *Id.* (quoting *Graham v. SEC*, 222 F.3d 994, 1006 (D.C.Cir.2000)).

within" the company and maintain the company's competitive position did not suffice to show motive and opportunity); *Vogel v. Sands Bros. & Co., Ltd.*, 126 F.Supp.2d 730, 739 (S.D.N.Y.2001) (a broker-dealer's "desire to realize greater transaction fees" and close relationship with its client were inadequate to show scienter); *Chill v. Gen'l Elec. Co.*, 101 F.3d 263, 269 (2d Cir.1996) ("motive would entail concrete benefits that could be realized by one or more of the false statements and wrongful nondisclosures alleged. The motive to maintain the appearance of corporate profitability, or of the success of an investment, will naturally involve benefit to a corporation, but does not entail concrete benefits.") (internal quotations omitted). Plaintiffs have made no such claim here.

As an alternative to the motive and opportunity test, courts have also acknowledged that plaintiffs may sometimes meet the scienter pleading requirement by alleging facts that amount to strong circumstantial evidence of conscious misbehavior or recklessness on the part of defendants. *Novak*, 216 F.3d at 308; [6] *Chill*, 101 F.3d at 269 ("an egregious refusal to see the obvious, or to investigate the doubtful, may in some cases give rise to an inference of ... recklessness."). In this vein, some

cases have noted that "a violation of GAAP, combined with other circumstances suggesting fraud, may create a strong inference of scienter." *In re Digi Int'l Inc. Sec. Litig.*, 6 F.Supp.2d 1089, 1099 (D.Minn.1998); *see also Baan*, 103 F.Supp.2d at 21; *In re Miller Indus. Sec. Litig.*, 12 F.Supp.2d 1323, 1332 (N.D.Ga. 1998).[7]

Although plaintiffs' tune sounds better in this key, their allegations as to what CIBC and Radin "must have known" illustrate a broader—and fatal—failing of their Complaint. Plaintiffs make only very general allegations as to the scope and content of CIBC's due diligence and Radin's audits. They do not, for instance, identify specific transactions that CIBC or Radin elected not to investigate or otherwise overlooked. Nor do they specifically allege that CIBC and Radin had access to particular pieces of information that would have revealed IBF's allegedly fraudulent and GAAP-violating inter-fund transfers.[8] Rather, plaintiffs repeatedly assert that CIBC and Radin simply could not have fulfilled their professional roles without coming across some evidence of fraud at IBF. It is true that a strong inference of scienter may be established "where the

---

**6.** The Second Circuit stressed in *Novak* that the PSLRA did not change, and indeed adopted, that court's "strong inference" standard, including recklessness as a basis for scienter, and that after the PSLRA "[i]n order to plead scienter, plaintiffs must 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'" 216 F.3d at 311 (quoting 15 U.S.C. § 78u–4(b)(2)).

**7.** Plaintiffs cite *In re Discovery Zone Sec. Litig.*, 943 F.Supp. 924, 937 (N.D.Ill.1996), for the proposition that GAAP violations alone can support an inference of scienter. The force of that case's scienter analysis in light of the PSLRA has been questioned. *See Chu v. Sabratek Corp.*, 100 F.Supp.2d 827, 836–37 (N.D.Ill.2000). Assuming for the moment

that egregious GAAP violations sufficed to show scienter, they would still have to be pleaded with the particularity required by the PSLRA, and not in the generalized style that characterizes the Complaint in this case.

**8.** Plaintiffs do allege that "CIBC was explicitly informed of the SEC's investigation of IBF by no later than January 2002, at which time Marshall Dornsfeld, a senior member of CIBC management, was told of the investigation by IBF President Ivan Krasner." Pl.'s Opp'n to CIBC's Mot. to Dismiss at 29 (citing Compl. ¶ 31). The trouble, of course, is that plaintiffs cannot use what CIBC knew in January 2002 to illuminate whether it acted with scienter in 2000 and 2001, when plaintiffs purchased IBF securities.

complaint sufficiently alleges that the defendants ... failed to check information they had a duty to monitor." *Novak*, 216 F.3d at 311. "[I]t is well established," however, "that a pleading of scienter may not rest on a bare inference that a defendant 'must have had knowledge of the facts.'" *In re Advanta*, 180 F.3d at 539 (quoting *Greenstone v. Cambex Corp.*, 975 F.2d 22, 26 (1st Cir.1992) (Breyer, J.)); *Mfrs. Life Ins. Co. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 2000 WL 709006, at *3–*4 & n. 5 (S.D.N.Y. Jun.1, 2000) (rejecting allegation of scienter based on underwriter's alleged access to information during due diligence). Here, only such an inference supports plaintiffs' allegation of recklessness.

Setting aside their theory of scienter, plaintiffs' factual allegations as a whole are plagued with imprecision. Plaintiffs concede that, except as to their own conduct, the allegations of the Complaint are made upon information and belief. Compl. at 1. The PSLRA requires that allegations made on that basis "state with particularity all facts on which that belief is formed." 15 U.S.C. § 78u–4(b)(1). Yet the Complaint does no such thing. It does not, for instance, identify specific misstatements and omissions in particular private placement memoranda for which CIBC or Radin should be held accountable—let alone the facts on which plaintiffs rely in concluding that such statements or omissions were fraudulent. More typical of the Complaint's cumulative and imprecise accusations is the following statement: "From the inception of Fund I in 1996, interest payments to noteholders of the IBF Funds have always been funded in significant part out of fresh offering proceeds because operating cash flows have never been suffi-

cient to cover these interest payments." Compl ¶ 43. What allegations like this fail to supply is the requisite specification of "each statement alleged to have been misleading, [and] the reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1); *see also Mayer v. Dell*, 1991 WL 21567, *4 (D.D.C. Feb.13, 1991) (dismissing a pre-PSLRA securities fraud claim where the complaint "fail[ed] to state with particularity the nature of each defendant's participation in the alleged fraud, what statements were made, when they were made, who made them, how those statements misled plaintiff, or what investments to which the statements pertained.").

Even in their scattered invocations of discrete alleged falsehoods or omissions, plaintiffs fail to state with particularity how CIBC or Radin played a role in misleading them. *See, e.g.,* Compl. ¶¶ 46–47 (stating that Fund VII made a materially misleading statement as to the source of its interest income in its May 10, 1999, private placement memorandum and that "Defendants knew from their experience with Funds I, II and III that interest payments would certainly be made out of note proceeds" rather than earned income).[9] The Complaint simply does not state with particularity the basis on which plaintiffs believe that CIBC and Radin defrauded them. Where, as here, a securities fraud complaint "requires a laborious deconstruction and reconstruction of a great web of scattered, vague, redundant and often irrelevant allegations," the spirit and letter of the PSLRA support dismissal. *Wenger v. Lumisys, Inc.*, 2 F.Supp.2d 1231, 1243 (N.D.Cal.1998); *see also In re Secure Computing Corp. Sec. Litig.*, 120 F.Supp.2d 810, 816 (N.D.Cal.2000) ("a complaint that requires such efforts to un-

---

9. Curiously, the term "Defendants" as defined by the Complaint does not include CIBC.

Compl. at 1.

derstand it does not comply with Rule 9(b) or the PSLRA.").[10]

■ Finally, plaintiffs' claims under Section 10(b) and Rule 10b–5 cannot proceed because plaintiffs fail adequately to allege causation. A plaintiff must plead that "the economic harm it suffered *occurred as a result of* the alleged misrepresentations." *Citibank, N.A. v. K–H Corp.*, 968 F.2d 1489, 1495 (2d Cir.1992) (emphasis original); *see also* 15 U.S.C. § 78u–4(b)(4). "It is settled that causation under the federal securities laws is two-pronged: a plaintiff must allege both transaction causation, i.e., that but for the fraudulent statement or omission, the plaintiff would not have entered into the transaction; and loss causation, i.e., that the subject of the fraudulent statement or omission was the cause of the actual loss suffered." *Suez Equity Investors, L.P. v. Toronto–Dominion Bank*, 250 F.3d 87, 95 (2d Cir.2001). "Like reliance, transaction causation refers to the causal link between the defendant's misconduct and the plaintiff's decision to buy or sell securities .... It is established simply by showing that, but for the claimed misrepresentations or omissions, the plaintiff would not have entered into the detrimental securities transaction." *In re Enron Corp. Sec. Litig.*, 310 F.Supp.2d 819, 831 (S.D.Tex.2004) (quoting *Emergent Capital Inv. Mgmt., LLC v. Stonepath Group, Inc.*, 343 F.3d 189, 196–97 (2d Cir. 2003)).[11] Loss causation is like the concept of proximate cause in tort law: "in order for the plaintiff to recover it must prove the damages it suffered were a foreseeable consequence of the misrepresentation." *Suez Equity*, 250 F.3d at 96. "If the allegations support an inference that a defendant could reasonably have foreseen that the misrepresentation pertained to an issue that would cause the eventual damage, loss causation will be considered adequately pleaded." *In re WorldCom, Inc. Sec. Litig.*, 294 F.Supp.2d 392, 413 (S.D.N.Y.2003).

On both prongs of the causation analysis, plaintiffs' allegations as to CIBC and Radin are insufficiently particular. First,

10. Indeed, plaintiffs effectively concede that they can not meet the specificity requirements of the PSLRA when they stress that all the offering materials in the aggregate were false and misleading, at least by omission, rather than emphasize specific untruths and the reasons for their deceptiveness. *See* 1st Tr. at 30–31. When pressed, plaintiffs were simply unable to identify truly specific allegations of fraud in the Complaint—allegations that clearly and succinctly state the nature, source, and direct impacts of individual falsehoods or omissions.

11. The difficulty of proving direct reliance in the securities fraud context has led courts to recognized what is commonly known as the "fraud-on-the-market" doctrine. Stated in general outline in a manner relevant to securities cases, the doctrine holds that "where materially misleading statements have been disseminated into an impersonal, well-developed market for securities, the reliance of individual plaintiffs on the integrity of the market price may be presumed." *Basic Inc. v. Levinson*, 485 U.S. 224, 247, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988). As Radin notes, the theory "rests on the assumption that the price of an actively traded security i n an open, well-developed and efficient market reflects all of the available information about the value of [the] company." *In re Newbridge Networks Sec. Litig.*, 767 F.Supp. 275, 284 (D.D.C.1991) (internal quotation omitted). Because no such market existed here—at least as to IBF's privately-placed securities—the theory is arguably inapposite. Some courts have invoked a so-called "fraud-created-the-market" theory to satisfy the transactional causation element in securities fraud cases relating to initial public offerings. *See Shores v. Sklar*, 647 F.2d 462 (5th Cir.1981); *T.J. Raney & Sons, Inc. v. Fort Cobb Irrigation Fuel Auth.*, 717 F.2d 1330 (10th Cir.1983); *Lipton v. Documation, Inc.*, 734 F.2d 740 (11th Cir.1984). Because the Court concludes that plaintiffs' allegations fail for want of particularity, it need not reach the applicability of either of these theories to this case.

as to transaction causation, plaintiffs' downfall is again their failure to allege with particularity the specific misrepresentations and omissions chargeable to CIBC and Radin. Where no specific misstatement or omission attributable to CIBC or Radin has been clearly identified, the Court can hardly conclude that plaintiffs would not have purchased IBF securities but for such misstatements or omissions. Second, as to loss causation, plaintiffs argue that "[i]t was clearly foreseeable by CIBC that when it sold the notes in the various Funds knowing or recklessly disregarding IBF's Ponzi scheme, that if the scheme was discovered, the securities that CIBC sold would be worthless." Opp'n to CIBC Mot. to Dismiss at 31; *see also* Compl. ¶ 31. This statement is deficient as an allegation of loss causation because it provides no factual basis for the proposition that the price of some identifiable IBF security was inflated by a particular statement or omission on the part of CIBC or Radin. *See In re WorldCom,* 294 F.Supp.2d at 397. Nor does plaintiffs' repeated invocation of IBF's bankruptcy supply evidence of loss causation. The Complaint simply does not spell out the logical steps between IBF's insolvency and the liability of CIBC and Radin for plaintiffs' loss.

In sum, plaintiffs' claims against CIBC and Radin under Section 10(b) and Rule 10b–5 fail for at least three independent reasons: they fail to plead scienter, they are not alleged with the specificity required by Fed. R. Civ. P. 9(b) and the PSLRA, and they fail to plead causation.

## C. Claims under Sections 11 and 12 of the Securities Act

In addition to their allegations of fraud, plaintiffs contend that Radin violated Section 11, and that CIBC violated Sections 12(a)(1) and 12(a)(2), of the Securities Act.

Section 11 imposes civil liability on issuers of securities or signatories, such as officers of the issuer and underwriters, of a registration statement that "contained an untrue statement of a material fact or omitted to state a material fact ... necessary to make the statements therein not misleading." 15 U.S.C. § 77k; *see also Rombach v. Chang,* 355 F.3d 164, 169 (2d Cir. 2004). Of the IBF Funds, only Fund VI is alleged to have filed a registration statement with the SEC—a form SB–2 dated August 23, 2000. *See* Compl. ¶ 144. Yet, as Radin points out, the Complaint contains no allegation that Fund VI made any loans to, or acquired any non-performing loans from, other IBF entities on Radin's watch. Radin Mot. Dismiss at 35. Instead, plaintiffs seek to sweep all the allegedly misleading placement memoranda within Section 11's reach by arguing that the "Fund VI public offerings were actually part of an integrated offering involving all of the IBF Funds." Compl. ¶ 146.

The case upon which plaintiffs rely principally in support of this integration argument, *Kennedy v. Tallant,* 1976 WL 840 (S.D.Ga. Oct.22, 1976), *see* 1st Tr. at 27, is of little aid to them. The court in that case found that seven public offerings of stock constituted an integrated offering for purposes of SEC Rule 147. *Id.* at *12–*13. Plaintiffs have marshaled no cases "integrating" public and private offerings for Section 11 purposes. As plaintiffs concede, 1st Tr. at 25, Section 11 was designed to protect purchasers of publicly-offered securities; their proposed expansion of liability to purchasers of privately-placed securities would thus seem inconsistent with the statute's purpose. *See Herman & MacLean v. Huddleston,* 459 U.S. 375, 381–82, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983) ("The section was designed to assure compliance with the disclosure provisions of the [Securities] Act by imposing a

stringent standard of liability on the parties who play a direct role in a registered offering."). Plaintiffs' novel integration theory, unsupported by applicable case law or policy, is not persuasive.

■ Plaintiffs' claim against CIBC under Section 12(a)(1) fares no better; it is barred by the applicable statute of limitations.[12] Section 13 of the Securities Act provides in relevant part:

No action shall be maintained to enforce any liability created under section 11 or section 12(a)(2) unless brought within one year after the discovery of the untrue statement or the omission, or after such discovery should have been made by the exercise of reasonable diligence, or, if the action is to enforce a liability created under section 12(a)(1), unless brought within one year after the violation upon which it is based. In no event shall any such action be brought to enforce a liability created under section 11 or section 12(a)(1) more than three years after the security was bona fide offered to the public, or under section 12(a)(2) more than three years after the sale.

15 U.S.C. § 77m. As to claims under Section 12(a)(1), the one- and three-year limitation periods "are not alternative—that is, plaintiffs must plead and prove facts demonstrating compliance with both limitations periods." *In re Chaus Sec. Litig.*, 801 F.Supp. 1257, 1265 (S.D.N.Y.1992). The one-year period "is measured from the date at which a violation occurred as to each share of stock. A violation occurs when there is an offer, sale, or delivery of unregistered stock" *In re Elec. Data Sys. Corp. ERISA Litig.*, 305 F.Supp.2d 658, 679–80 (E.D.Tex.2004); *accord Blatt v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 916 F.Supp. 1343, 1354 (D.N.J.1996).

The three-year period runs from the time the stock was initially bona-fide offered to the public. *See P. Stolz Family P'ship v. Daum*, 355 F.3d 92, 100 (2d Cir.2004). Here, Prather does not allege that he purchased IBF securities anytime after March 26, 2001, and his initial Complaint against CIBC was filed on June 23, 2003, more than two years later. Additionally, Prather's 12(a)(1) claim may fail the three-year test—given the Complaint's imprecision about which IBF securities he purchased, it is impossible to tell when the allegedly offending securities were initially bona-fide offered. Assuming that the start of the purported Class Period—July 26, 1999—is the date upon which a security purchased by Prather was first offered, time has run on any claim he may have had.

■ Prather's claim under Section 12(a)(2) cannot succeed for slightly different reasons. CIBC is correct that the Complaint does not, as it must, affirmatively plead facts indicating that the action has been timely brought. *Davidson v. Wilson*, 973 F.2d 1391, 1402 n. 8 (8th Cir. 1992) (compliance with Section 13 must be pled with specificity because timeliness is a substantive requirement of a Section 12(a)(2) cause of action). But the Section 12(a)(2) claim suffers from a more basic infirmity: Prather has not alleged that he purchased IBF securities in public offerings, and Section 12(a)(2) does not apply to purchases in aftermarket or private transactions. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 569, 115 S.Ct. 1061, 131 L.Ed.2d 1 (1995); *Maldonado v. Dominguez*, 137 F.3d 1, 8–9 (1st Cir.1998) ("the Supreme Court has conclusively decided that section 12[ (a) ](2) applies exclusively to initial public offerings"). He cannot establish standing to sue on the hypothesized pur-

12. After initially arguing that the Sarbanes–Oxley Act supplied the applicable statute of limitations, *see* Pl's. Opp'n to CIBC's Mot. to Dismiss at 33, plaintiffs now concede, as to Section 12(a)(1), that Section 13 governs, *see* 2d Tr. at 44.

chases of members of his uncertified class. Accordingly, the Section 12(a)(2) claim cannot survive.

### D. Leave to Amend

Finally, while FED. R. CIV. P. 15(a) provides that "leave [to amend] shall be freely given when justice so requires," a "bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which the amendment is sought . . .—does not constitute a motion within the contemplation of Rule 15(a)." *Confederate Mem'l Ass'n Inc. v. Hines*, 995 F.2d 295, 299 (D.C.Cir.1993); *accord Kowal*, 16 F.3d at 1280. Plaintiffs' arguments in the alternative during hearings on the present motions—*see* 1st Tr. at 25–26; 2d Tr. at 46—do not amount to formal motions for leave to amend. Furthermore, the words and legislative goals of the PSLRA would seem to counsel restraint in granting leave to amend. *See In re Champion Ent., Inc. Sec. Litig.*, 145 F.Supp.2d 871, 873 (E.D.Mich.2001) ("The plain language of the [PSLRA] does not contemplate amending complaints; it does set a high standard of pleading which if not met results in a mandatory dismissal. The necessary goal of this plain, and strong language, is that it should be dismissed *with prejudice*. To conclude otherwise would be to abrogate the very purpose of the legislation.") (emphasis original). Accordingly, plaintiffs' claims as to CIBC and Radin shall be dismissed with prejudice.

### CONCLUSION

Because plaintiffs have failed to meet the stringent pleading requirements established by the PSLRA and relevant case law, their claims against CIBC and Radin under Section 10(b) and Rule 10b–5 must be dismissed. Their claims under Sections 11 and 12 also fail for the reasons ex-plained. A separate order has been issued on this date.

### *ORDER*

Upon consideration of the motions to dismiss filed by defendants CIBC World Markets Corp. and Radin Glass & Co., and for the reasons elaborated in the Memorandum Opinion issued on this 9th day of August, 2004, it is hereby

ORDERED that the motions are GRANTED; and it is further

ORDERED that plaintiffs' claims against CIBC and Radin are DISMISSED WITH PREJUDICE.